## IN RE PATRICIA C. ET AL.*
## (AC 25446)

Schaller, Harper and Hennessy, Js.

Argued October 14, 2005—officially released January 3, 2006

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Shawn L. Council*, for the appellant (respondent mother).

*Susan T. Pearlman*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (petitioner).

*Kathleen Berry*, for the minor children.

*Opinion*

SCHALLER, J. The respondent mother appeals from the judgment of the trial court denying her motion to revoke the commitment of her two minor children, P and W, and approving the permanency plan requested by the petitioner, the commissioner of children and families (commissioner).[1] On appeal, the respondent claims that the court improperly maintained the commitment and approved the permanency plan of long-term foster care. We affirm the judgment of the court.

[1] Only two of the respondent mother's children, P and W, are the subjects of this appeal.

The record discloses the following facts and procedural history relevant to the respondent's appeal. The commissioner filed neglect petitions alleging that the children were being denied proper care and attention and living in conditions that were injurious to their well-being. In an addendum to the petitions, the commissioner set forth the following: "[The respondent] is not providing for the children's physical needs in that the conditions of the home and the children are unkempt and dirty. [The respondent] does not provide for the educational needs of the children in that . . . [P] has been absent eleven days and tardy seven [and W] has been absent six days and tardy ten days since they began school on October 27, 1999. [The respondent] has not address[ed] [the] children's medical needs in that the children have not been followed up with medical providers for hearing, sight and lice. [The respondent] has provided inadequate supervision for the children in that [an older sibling] has taken the role of the parent. [Finally, the] [f]ather is currently incarcerated and unable to provide for his children." The commissioner applied for and received an order of temporary custody, effective March 10, 2000. On August 16, 2000, the court adjudicated the children to be neglected and ordered that they be committed to the care and custody of the commissioner. That commitment was extended on several occasions, during which time the children were placed into foster care.[2]

The court specifically ordered the respondent to cooperate with the department of children and families (department) and to keep all appointments, as well as to inform both the department and the children's attorney as to her whereabouts. The respondent also was instructed to participate in both individual and

[2] The foster parents are related to the children and also care for one of the children's older siblings.

parenting counseling and to submit to random drug testing and a substance abuse evaluation.

In an order dated September 2, 2003, the court, *Dannehy, J.*, found clear and convincing evidence that it was not reasonable to continue making efforts to reunify the children with the respondent and approved the department's plan of placing them in long-term foster care with the relatives with whom they had been living. Judge Dannehy also determined that a cause for commitment remained. The court found that the respondent's one bedroom Hartford apartment was too small for her, the children's father and the two children, and instructed the respondent to obtain adequate housing before the commitment could be revoked. The respondent maintained weekly contact with the children by way of daylong Sunday visits.

In March, 2004, the commissioner filed a motion to review the permanency plan and to maintain the commitment. The respondent filed an objection, arguing that no cause for commitment presently existed, as the respondent had moved into a two bedroom apartment in East Hartford. She also filed a motion to revoke the commitment.

On May 4, 2004, the court, *Hon. William L. Wollenberg*, judge trial referee, held a hearing with respect to the parties' motions. At the hearing, two witnesses testified and two social studies were presented to the court for review. At the conclusion of the hearing, the court issued its oral decision. The court determined that the primary issue for the commitment had been the lack of adequate housing, specifically, the size of the respondent's Hartford apartment.[3] The court noted that the respondent subsequently had moved into a two

---

[3] The court later speculated that the housing issue may have been only "the starting point" before Judge Dannehy and that other issues may have had to be resolved before the commitment could be revoked.

bedroom apartment in East Hartford but had failed to obtain sufficient furniture. Although the apartment contained several pieces of electronic equipment, such as a big screen television, a DVD player and a laptop computer, the only furniture was a futon couch. There were no tables, chairs or beds, and there was nothing in the children's bedrooms. The court also was troubled by the respondent's failure to actively seek reunification with her children.[4] The court ultimately concluded that it would be in the children's best interests to remain with the foster parents. The court approved the permanency plan and denied the respondent's motion to revoke the commitment. The court further relied on a prior ruling that the department did not need to make efforts to reunify the children with the respondent. This appeal followed.[5] Additional facts will be set forth as necessary.

[4] The court's oral decision provided in relevant part: "Big thing in this matter that I see is that the parents, and I asked these questions, I think, of a couple of people who came out here, and I am trying to look for it, what did the parents do to generate interest in [the department] to have these children back in their home? When did they pick up the phone and say when am I getting my children back? When can they come back? I do not have any evidence of that at all. It was all a stand, wait and see. Who's doing it for type of thing, and I think that is the attitude. Nothing is being done for me. I do not need to do anything myself. I am waiting for somebody to do something for me, and I think this borne out tremendously in a situation with the housing, the two bedrooms and one piece of furniture in the house. I think that is borne out. What are you—what have you done for yourself lately to get these children back?"

[5] Subsequent to filing her appeal, the respondent filed a motion for an articulation of the court's order, which was denied. This court granted her motion for review and ordered the trial court to articulate the "other issues" mentioned in its oral decision and how those "other issues" may have affected the decision.

In response, the trial court submitted the following: "To the best of my recollection, as reflected in the record, these 'other issues' included the testimony that the children have been in foster care since March 10, 2000, and are bonded to each other, including their older sibling, N, who also lives in the same foster home. Additionally, both P and W have adjusted well to their surroundings and are now very bonded to their foster home as well.

"At the time of the filing of the petitions [for neglect], their basic needs, including medical, education and their living conditions, were not being met. Both parents were given time from March 10, 2000, until September

The respondent claims that the court improperly denied her motion to revoke the commitment of her two children and approved the department's permanency plan of long-term foster care. We begin by setting forth the legal principles that apply to this issue. "Our review of this claim is controlled by General Statutes § 46b-129 (m), which provides in relevant part: The commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, upon finding that cause for commitment no longer exists, and that such revocation is in the best interest and welfare of such child or youth, the court may revoke the commitment of any child or youth. . . . The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests." (Internal quotation marks omitted.) *In re Krystal J.*, 88 Conn. App. 311, 314, 869 A.2d 706 (2005); see also *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 659, 420 A.2d 875 (1979); *In re Juvenile Appeal (85-1)*, 3 Conn. App. 158, 160, 485 A.2d 1355 (1985). With respect to the best interest prong, "when it is the natural parents who have moved to revoke the commitment, the state must prove that it would not be in the best interests of the child to be returned to his or her natural parents." *In re Thomas L.*, 4 Conn. App. 56, 57, 492 A.2d 229 (1985).

We now set forth the applicable standard of review. "On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. We do not examine the record to determine whether the trier of fact could have reached a conclu-

30, 2003, to comply with the specific steps ordered by the court in order for them to be reunified with the children; however, on September 3, 2003, a finding was made by the court that reunification was no longer appropriate by clear and convincing evidence. This finding was also considered in the overall ruling of the case as it relates to 'other issues.' "

sion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous." (Internal quotation marks omitted.) *In re Krystal J.*, supra, 88 Conn. App. 314–15; *In re Cesar G.*, 56 Conn. App. 289, 293, 742 A.2d 428 (2000).

In the present case, the court focused on the best interests of the children and did not make an express finding with respect to the issue of whether a cause for commitment remained. Although the court referred to the housing issue, as well as to the respondent's depression, it is not clear whether the court found that those factors constituted a reason for commitment.[6] Although the respondent successfully filed a motion for an articulation, the trial court, in its articulation, did not identify or explain whether a cause for commitment continues to exist. The respondent did not make any further request or file a motion for further articulation in that matter. We therefore conclude that we have been presented with an inadequate record and lack the basis from which to determine whether the trial court improperly failed to make an express finding with respect to the issue of whether a cause for commitment remains. See *In re Juvenile Appeal (85-1)*, supra, 3 Conn. App. 161 (ambiguous decision provided no firm basis on which we could determine whether trial court had abused its discretion).

To revoke the commitment, the respondent must first prove that no cause for commitment presently exists. Second, the commissioner must fail in her burden to

---

[6] The court file does not set forth details as to the reasons for the original commitment.

establish that it would be in the best interests of the children to remain committed. Both prongs must be satisfied in favor of the respondent in order for the commitment to be revoked. Although the court failed to identify its findings with respect to the issue of whether a cause for commitment remained,[7] and the respondent therefore cannot establish that the court's ruling was improper, under the facts and circumstances of this case, we are able to resolve the respondent's appeal on the basis of the court's clear and unequivocal finding that it would be in best interests of the children to remain with their foster parents.[8] We therefore turn our attention to that issue.

"To determine whether a custodial placement is in the best interest of the child, the court uses its broad discretion to choose a place that will foster the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment. . . . We have stated that when making the determination of what is in the best interest of the child, [t]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred

[7] We are presented with a situation in which both the respondent and the commissioner have presented pertinent and germane evidence and argument regarding whether a cause for commitment remained. It is not for this court, however, to make the initial finding as to whether the respondent, as the party moving to revoke the commitment, carried her burden of establishing that no cause for the commitment remains. It is our function to review, under a deferential standard, the decision of the trial court, which had the opportunity to observe firsthand the credibility and demeanor of the witnesses. See, e.g., *In re Thomas L.*, supra, 4 Conn. App. 57–58.

[8] The ordinary and preferred course of action would be for the trial court first to identify the basis for its factual finding with respect to the issue of whether a cause for commitment exists. Only if it finds that the party seeking the revocation of the commitment has proven that no cause for commitment exists should the court then proceed to the second prong concerning the best interests of the children. Particularly in cases involving the care and custody of children, it is incumbent on the trial courts to provide a decision, whether written or oral, that includes all of the necessary factual findings for the benefit of the parties, as well as for proper appellate review.

upon this court, but upon the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . *A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference.* . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Citation omitted; emphasis added; internal quotation marks omitted.) *In re Haley B.*, 81 Conn. App. 62, 67, 838 A.2d 1006 (2004); *In re Alexander C.*, 60 Conn. App. 555, 559, 760 A.2d 532 (2000). Guided by that deferential standard of review, we examine the evidence that was before the court to determine whether it abused its discretion in finding that the commissioner successfully established that it would be in the best interests of the children to remain in the custody of the foster parents.

Two witnesses testified at the hearing. The first was Geoff Genser, a social worker, who testified that the respondent had participated in his parenting class. Genser stated that she completed that course by attending sessions on a weekly basis from January through April, 2003. He further indicated that she suffered from a form of depression known as dysthymia.[9] Genser explained that dysthymia is a long-lasting, mild form of depression and that the respondent would benefit from additional treatment. He did believe, however, that the respondent could parent her children adequately.

[9] Dysthymia is defined a "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." T. Stedman, Medical Dictionary (27th Ed. 2000) p. 556. Genser diagnosed the respondent on the basis of his interactions with her.

On cross-examination by the commissioner, Genser stated that depression could negatively affect the parenting abilities of an individual in the areas of adequate supervision, providing both food and a home, ensuring that the children's medical needs were met and that they attended school. In short, Genser testified that the respondent's depression could be a factor with respect to the conditions that led to the filing of the neglect petitions. Genser also noted that the depression suffered by the respondent could have caused her to procrastinate in obtaining a larger apartment, which she had been instructed to obtain by a prior court order.

The other witness to testify at the hearing was Annette Charles, a social worker employed by the department and who had been assigned to the respondent's case in February, 2003. Charles indicated that she performed monthly visits to the respondent's home. Charles testified that the respondent moved from her one bedroom apartment in Hartford to a two bedroom apartment in East Hartford, but failed to inform the department of that change in address. Charles was unable, therefore, to conduct her visits from November, 2003, until March, 2004, when she learned of the respondent's new address. Charles also stated that the respondent recently had left her employment and was, at the time of the hearing, unemployed. Finally, she testified that the children were ambivalent about returning to the custody of the respondent.

The court judicially noticed two social studies that were contained in the court file. The first study, dated April 4, 2003, indicated that the respondent had fulfilled the majority of the steps that had been ordered by the court on August 16, 2000. She had submitted to the department's home visits, kept her whereabouts known to the department, consistently visited the children, refrained from substance abuse and involvement with the criminal justice system, and maintained employ-

ment. The only step that she had not completed at the time of that social study related to the housing issue, namely, obtaining a larger apartment.[10]

The April 4, 2003 study indicated that both of the children were doing well in their foster home, had bonded with the foster parents and were doing well in school. The foster parents appeared to be committed to caring for the children. Although the children indicated a desire ultimately to return to the respondent's home, nevertheless, the study indicated that the appropriate permanency plan for the children was to remain in long-term foster care. The study concluded that the respondent had made little or no effort to reunify with her children and that the children had bonded with the foster parents and did not want to be separated from their older sibling, who also lived with them in foster care. Finally, the April 4, 2003 study stated that despite the children's interest in reunifying with the respondent, they wanted to remain with their foster parents at that time.

The second social study, dated February 23, 2004, stated that the children had adjusted "very well" to their surroundings and were "very bonded" to the foster parents, who remained "very invested" in their caring. Both children continued to do well in school and had accepted the fact that reunification with the respondent was no longer the case goal. According to that study, the respondent had not taken advantage of department services, but did maintain the weekly visits with the children. The second study concluded that long-term foster care remained in the best interests of the children.

---

[10] According to the social study, the respondent indicated that she had not taken any steps in an effort to obtain a larger apartment. Although the respondent had observed a sign advertising an apartment for rent on her way to work, she had not taken any further steps, such as obtaining a telephone number to contact the landlord or to inspect the apartment.

The court, in its decision, clearly credited the social studies, as well as certain aspects of the testimony of the witnesses. The court also appeared to credit the evidence concerning the respondent's indifference about reunifying with the children. For example, she did not seek to increase the frequency or duration of the visits, and it took her a significant amount of time to obtain a larger apartment, which was inadequately furnished. Although the respondent did complete Genser's parenting class, there was no evidence that she sought individual counseling to help with her depression. Furthermore, she recently had become unemployed. In short, the court found, on the basis of all the evidence, that the commissioner had proved that it remained in the children's best interests to be committed to the custody of the foster parents.

"[G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . *We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached.* . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling. . . . [*Additionally, we] are not in a position to second-guess the opinions of witnesses, professional or otherwise, nor the observations and conclusions of the Juvenile Court when they are based on reliable evidence."* (Citation omitted; emphasis added; internal quotation marks omitted.) *In re Jeisean M.,* 270 Conn. 382, 397–98, 852 A.2d 643 (2004). As our recitation and review of the evidence before the court indicates, there were ample facts on which it could find that it was in the best interests of the children to remain in foster care. Mindful of our limited standard of review, we conclude that the trial court's decision that continued commit-

ment was in the children's best interests was not in abuse of that court's discretion.

The judgment is affirmed.

In this opinion the other judges concurred.