# IN RE BRIANNA C.*
## (AC 26506)

Flynn, C. J., and DiPentima and Dupont, Js.

Argued September 20, 2006—officially released December 26, 2006

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Mildred Doody*, for the appellant (respondent mother).

*A. Kim Mathias*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Thomas F. Mitola*, for the minor child.

*Opinion*

DUPONT, J. The issues of this appeal from the judgment of the trial court are whether the infant daughter of the respondent mother should have been adjudged "neglected," and, if so, whether the child should have been committed to the custody of the petitioner, the commissioner of children and families (commissioner), and placed in the foster care of the minor child's paternal aunt, with daily eight hour unsupervised visits by the respondent.[1] The attorney for the minor child joins the respondent in her claim that the court abused its discretion in finding that it was in the child's best interest to commit her to the care and custody of the commissioner.[2]

___

[1] The father of the minor child has not appealed from the judgment. We therefore refer in this opinion to the respondent mother as the respondent.

[2] The attorney for the child does not argue that the minor child was not neglected within the definition of General Statutes § 46b-120 (9) (B) or (C) but that, in accordance with General Statutes § 46b-129 (j), the minor child should have been placed in the custody of the respondent with or without protective supervision.

General Statutes § 46b-129 (j) provides in relevant part that "[u]pon finding and adjudging that any child or youth is . . . neglected . . . the court may commit such child . . . to the [commissioner] . . . . Said commissioner may place any child or youth so committed to the commissioner in a suitable foster home or in the home of a person related by blood to such child or youth . . . . As an alternative to commitment, the court may place the child

The child was born on September 23, 2004. An ex parte order of temporary custody (order) was issued on December 30, 2004. That order and a neglect petition were contested by both parents of the child and were consolidated for trial.[3] The order was subsumed in the ruling of the court on March 15, 2005, which ruling concluded that the child was not at any time in immediate physical danger and that therefore no grounds for the order existed but that the child was "neglected" and should be committed to the commissioner's custody.

The order was issued following an incident on October 8, 2004. At the time of the incident, the respondent and the father were living together. The respondent awoke at approximately 2:45 a.m. from a nap she was taking on a couch and saw her baby, naked and shivering on a wet towel on the parents' bed, with the father awake and lying next to the baby. The respondent tried to pick up the baby, but the father grabbed her arm with one hand and held his other hand over the baby's chest, saying that the baby needed to "air out." The respondent was able to pick up the baby and dress her, after which the father left. The respondent went to a domestic violence shelter and a few days after the incident spoke about it with an investigating social worker for the department of children and families (department). The respondent stated to the social worker that

or youth in the custody of the parent or guardian with protective supervision by the [commissioner] subject to conditions established by the court. . . ."

[3] The ex parte order of temporary custody was based on affidavits of a social worker for the department of children and families (department). One affidavit referred to a psychotic episode by the child's father that was a basis of the neglect petition. The affidavit also referred to the respondent's history with the department during the prior four years and included her mental health history in which depression and suicidal ideation were a part. The neglect petition was accompanied by a similar affidavit.

The court heard testimony or received affidavits from two social workers for the department and from a program supervisor for the department to aid in its decision. It also heard the forceful opinion of the attorney for the child that the child should have been placed in the custody of the respondent.

she was afraid of the father because he was a paranoid schizophrenic who had not been taking his medication. On October 20, 2004, the baby was hospitalized for a respiratory illness, which the respondent testified was bronchitis. The father was in a hospital for psychiatric treatment from mid-October, 2004, until November 2, 2004.[4] On November 8, 2004, the father signed an agreement with the department, stating that he would not reside with the respondent and their baby. A neglect petition was filed on December 29, 2004, alleging the reasons for the department's concerns for the baby's well-being. Among the reasons were the father's failure to take medication regularly, which could lead to another psychotic episode that could put the baby at risk, the respondent's lack of concern about smoking near the baby, given the baby's respiratory problems, the respondent's failure to recognize that the father's behavior could be hazardous for her and the baby, and her past history with the department.

The March 15, 2005 order of the court committed the minor child to the custody of the commissioner and ordered physical custody to be in the home of a paternal aunt. The order granted unsupervised eight hour daily visitation to the respondent, ending not later than 6 p.m., and allowed her to take the child with her during that time to any appointments that were necessary for the baby outside of the aunt's home. If the respondent did not take the child, the paternal grandmother would have primary care of the child while the aunt was at work. The father was entitled to daily, supervised visits between 6 p.m. and 8:30 p.m., as allowed by the paternal aunt. The supervision could be with either the paternal

---

[4] The court did not specifically find when the father entered the hospital, and there is conflicting testimony. The father's mental health clinician testified that the father had entered the hospital on October 14, 2004. Sarah Adams, a department social worker, testified that he had entered the hospital on October 26, 2004.

aunt or the paternal grandmother of the child. The court also specifically noted that if this arrangement proved inconvenient, the parties could agree to another suitable party to supervise the father's visits.

Neglect proceedings, under General Statutes § 46b-129, are comprised of two parts, adjudication and disposition. *In re David L.*, 54 Conn. App. 185, 191, 733 A.2d 897 (1999). Our standard used to review both the adjudication and disposition portions of the neglect proceeding is the same. When this court reviews the facts found by a trial court, the review is "governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *In re Kaurice B.*, 83 Conn. App. 519, 523, 850 A.2d 223 (2004). The burden of proof is on the petitioner to show by a fair preponderance of the evidence that removal of a child from his or her home is warranted. *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 293–95, 455 A.2d 1313 (1983).

I

The respondent first claims that it was an abuse of discretion for the court to conclude that the child suffered from neglect. Pursuant to § 46b-129, before determining custody of a minor child, the court must determine whether the child was neglected, uncared for or dependent. General Statutes § 46b-120 (9) provides that a child may be found neglected when, among other things, the child: "(B) is being denied proper care

and attention, physically, educationally, emotionally or morally, or (C) is being permitted to live under conditions, circumstances, or associations injurious to the well-being of the child or youth . . . ." A finding of neglect is not necessarily predicated on actual harm, but can exist when there is a potential risk of neglect. *In re Jermaine S.*, 86 Conn. App. 819, 831, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005). The standard of proof applicable to nonpermanent custody proceedings, such as neglect proceedings, is a fair preponderance of the evidence. *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 263, 471 A.2d 1380 (1984); Practice Book § 32a-3 (a).

Here, the court determined that the child was neglected, under the statute, because the child was denied proper care pursuant to subparagraph (B) and was being permitted to live under conditions injurious to the child's well-being, pursuant to subparagraph (C).

The court provided reasons for its finding that the child was allowed to live under conditions injurious to her well-being. The court stated that it was "concerned that something like [the October 8, 2004 incident] might happen again; medication is not being monitored, [the respondent], this court believes, based upon what it has heard, lacks the ability, on her own, to protect [the child] from the father." The court found that the father was not taking his medication for a time prior to the October 8, 2004 incident. The court emphasized that "the problem is—that [the] father does have a mental health condition that is subject to decompensating at anytime, and the court recognizes that both [the] father and [the respondent] are unable to . . . discern when that decompensating is . . . occurring."[5]

---

[5] The court heard testimony that the respondent had not discussed with anyone the risk the father might pose to the child when he is not taking his medication as prescribed.

The court found that the respondent was not able to protect the child adequately from the actions of the father. The court again focused on the incident of October 8, 2004. The court found that when the respondent tried to intervene in the father's "airing out" of the minor child, the father resisted the respondent's attempt to pick up the child.

On the basis of the facts found by the court, we conclude that by a fair preponderance of the evidence, the child was neglected within the definition of § 46b-120 (9) (C). Although it appears that there was no actual harm done to the child, the court properly could have found, on the evidence before it, that just prior to the October 8, 2004 incident, the father was not taking his medication as required to remedy his known mental health condition, and that neither he nor the respondent understood, or attempted to learn, the extent of the risk that the father may have posed to the child in his unmedicated state.[6]

## II

In this case, the more difficult issue is whether the court abused its discretion when it ordered the commitment of the child to the commissioner. The respondent's arguments relating to the commitment of the child to the care and custody of the commissioner consist of two claims. The first is that the court abused its discretion in finding that it was in the child's best interest to commit her to the care and custody of the commissioner.[7] The

---

[6] Because we agree that the court could properly find that the child was neglected pursuant to § 46b-120 (9) (C), we need not review the court's determination that the child was also neglected pursuant to § 46b-120 (9) (B).

[7] The respondent claims that the advantages of a parent's care are high on the scale of what is in the "best interest of the child" and that her liberty interest in raising her child was not considered adequately by the court. This claim of family integrity, according to the commissioner, was not preserved and was not briefed adequately. We agree. Although family integrity is protected by the due process clause of the fourteenth amendment to the United States constitution; *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); the commissioner points out that the

second is that the court improperly found that the department had made reasonable efforts to prevent the removal of the child from the respondent's care.

A

After an adjudication of neglect, a court may (1) commit the child to the commissioner, (2) vest guardianship in a third party or (3) permit the parent to retain custody with or without protective supervision. General Statutes § 46b-129 (j). The child's attorney and the respondent argue that the third alternative was appropriate in this case, as it was in the best interest of the child.

In determining the disposition portion of the neglect proceeding, the court must decide which of the various custody alternatives are in the best interest of the child. "To determine whether a custodial placement is in the best interest of the child, the court uses its broad discretion to choose a place that will foster the child's interest in sustained growth, development, well-being, and in the continuity and stability of [the child's] environment." (Internal quotation marks omitted.) *In re Haley B.*, 81 Conn. App. 62, 67, 838 A.2d 1006 (2004). At trial, the commissioner had the burden of proving by a fair preponderance of the evidence that it was in the child's best interest to be committed to the commissioner rather than to remain with the respondent. See id., 65. On appeal, we must determine whether there was sufficient evidence before the court so that it reasonably could find, by a fair preponderance of the evidence, that the best interest of the child was to commit custody

respondent had a multiday evidentiary hearing that provided her with due process. She makes no specific claim of a violation of her constitutional rights, and we do not review the general claim that family integrity was not considered by the court. We note, however, that § 46b-129 has been held to be constitutional and not violative of the fourteenth amendment's due process right to family integrity. *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 293.

of her to the commissioner, with eight hours daily of unsupervised visits with the respondent.

We first note that the commitment in this case is not one of "permanency," such as a judgment of termination of parental rights, but one that requires, pursuant to § 46b-129 (j), the court to "order specific steps which the parent must take to facilitate the return of the child or youth to the custody of such parent."[8] The court specifically told the respondent that if she followed all the conditions, the compliance would help her reunite with her child. In addition, we also note that the commissioner represented to the court that the child would be placed in the home of the child's paternal aunt, a home known to both the parents. The statute also specifically states that commitment to the commissioner "may be revoked . . . at any time by the court . . . ." General Statutes § 46b-129 (j).

The commitment was a difficult, nobody wins situation that makes it necessary to choose whether the interest of the child to have a constant twenty-four hour per day, year-round relationship with the respondent is in the child's best interest when weighed against the possibility that the respondent is unable to prevent the child's father from causing injury to the well-being of the child in the event that he fails to medicate himself appropriately. In this case, there may be no "best," but only a "better," solution. We cannot substitute our view for the discretion of the trial court. "Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference." (Internal quotation marks omitted.) *In re Haley B.*, supra, 81 Conn. App. 67.

---

[8] In this case, the specific steps were many, including unannounced visits to the respondent and the child by department workers, attendance at parenting classes, individual and domestic counseling, and protective orders against the child's father to safeguard the child.

Here, the court relied primarily on a finding that the father posed a potential risk of harm to the child, and that the respondent, alone, was unable to protect the child from the father. The court stressed that the father had not been taking his medication prior to the incident of October 8, 2004. Although he subsequently had taken it regularly, there was no one monitoring him to make sure that he continued to take his medication as required. Further, the court noted that neither parent understood, or attempted to learn, the extent of the risk that the father's mental condition, when untreated, may have posed to the child, nor could either tell when the father's judgment might become clouded by the "decompensation" process. The court recognized that the respondent could care for her child in a safe manner, unsupervised for eight hours every day, and that, at least for the present, the court's order was a temporary "better safe than sorry" solution to the situation. The court specifically stated that if the respondent complied with the conditions for total reunification with her daughter, she, instead of the commissioner, would have custody.

The evidence supporting the court's finding was sufficient to warrant the court's determination, by a fair preponderance of the evidence, that the child's best interest was to remain, at least for a time, in the custody of the commissioner, particularly in view of the liberal, unsupervised visits by the respondent with her child.

B

The respondent also claims that the court abused its discretion when it found that the department had made reasonable efforts to keep the child with the respondent before seeking custody of the child. The last sentence of § 46b-129 (j) provides in relevant part: "Upon the issuance of an order committing the child or youth to the [commissioner], or not later than sixty days after

the issuance of such order, the court shall make a determination whether the [department] made reasonable efforts to keep the child or youth with his or her parents or guardian prior to the issuance of such order . . . ."

The court made the determination that "[w]hile the department, perhaps, didn't do everything that it reasonably could have done to prevent removal from the home, the court is satisfied that the department did make reasonable efforts, not all efforts, not all that perhaps should have been done, but made reasonable efforts to prevent removal from the home." The court based its determination on various facts and testimony. The respondent went to Safe Haven of Greater Waterbury, Inc., a violence shelter, soon after the October 8, 2004 incident. While there, Kelly Adams of the department met with the respondent for counseling purposes. The respondent was referred by the department to the coordinating council for children in crisis for parenting and domestic violence services. In addition, the child was referred to the Birth to Three program to assess the child's cognitive ability. The father was referred to 'R Kids, Inc., for parenting classes. An ex parte temporary custody order was issued on December 30, 2004. The court, *Hon. John T. Downey*, judge trial referee, found that the previously mentioned actions by the department amounted to reasonable efforts to prevent or to eliminate the need for removal of the child. The court, *Turner, J.*, on March 15, 2005, also found that the department had made reasonable efforts.

We conclude that there was sufficient evidence from which the court could find that the department had made reasonable efforts to keep the child and the respondent together before the court issued the order, which is the subject of this appeal.

The judgment is affirmed.

In this opinion the other judges concurred.