## IN RE SHANAIRA C.*
## (AC 28419)

Bishop, Gruendel and Borden, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

714

Argued November 13, 2007—officially released February 12, 2008

*Roseann Canny*, for the appellant (intervenor Stephanie E.).

*Patricia B. Johnson*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Marcia McCormack*, for the appellee (respondent mother).

*Trudy Condio*, for the minor child.

*Opinion*

BISHOP, J. This appeal arises from a neglect petition that resulted in the commitment of the minor child, Shanaira, to the custody of the petitioner, the commissioner of children and families (commissioner), and the subsequent revocation of that commitment. The intervening former girlfriend of Shanaira's father,[1] Stephanie E. (intervenor), appeals from the judgment of the trial court revoking the commitment of Shanaira to the custody of the commissioner. On appeal, the intervenor contends that the court (1) violated her due

---

[1] The neglect petition named both the child's father and mother as respondents. Because only the respondent mother has participated in this appeal, we refer to her as the respondent.

process rights in failing to allow her to introduce evidence at the revocation hearing and (2) abused its discretion in revoking the commitment. We affirm the judgment of the trial court.

The following factual and procedural history is germane to our resolution of the intervenor's appeal. On March 28, 2006, the commissioner filed a neglect petition and motion for an order of temporary custody of Shanaira on the basis of allegations of medical and educational neglect, as well as domestic violence and drug abuse by the father. The court granted the order. At that time, Shanaira had been residing with her father and his girlfriend, the intervenor. On April 3, 2006, the intervenor filed a motion to intervene, which was granted by the court on May 9, 2006. On July 6, 2006, the intervenor filed a motion to transfer guardianship of Shanaira to herself, and, on September 18, 2006, she filed a motion for visitation. The court consolidated the trial of these motions with the trial of the neglect petition.

After three days of trial, on October 17, 2006, the court adjudicated Shanaira neglected. The court also denied the intervenor's motions for guardianship and visitation.[2] On November 2, 2006, the court committed Shanaira to the custody of the commissioner. The court continued the matter to December 15, 2006. In doing so, the court expressed its intention to send Shanaira to Florida to live with the respondent mother.

On December 12, 2006, the commissioner filed a motion to revoke the commitment of Shanaira on the ground that reunification with the respondent mother, in Florida, was in the child's best interest. The motion to revoke was heard on December 15, 2006, and all

---

[2] The intervenor subsequently filed a motion for reargument or reconsideration of her motions, which was denied on November 13, 2006. The intervenor did not appeal from that ruling to this court.

parties were present. The commissioner submitted to the court a status report, a report from Shanaira's therapist and a report from the mother's therapist. The intervenor opposed the motion to revoke and informed the court that she would be calling witnesses, including her mother and Shanaira's aunt, who was also the foster mother. The attorney for the minor child also indicated that she had one witness, Shanaira's schoolteacher. The court allowed testimony from Shanaira's aunt and teacher. On the basis of the reports submitted by the commissioner, the testimony and the statements of counsel, including that of the intervenor, the court found that revocation of the commitment was in Shanaira's best interest and granted sole custody of Shanaira to the respondent mother. This appeal followed.

Because the respondent mother challenges the intervenor's standing to bring this appeal, and such a claim implicates our jurisdiction, we address that issue first. See *West Farms Mall, LLC* v. *West Hartford*, 279 Conn. 1, 11 n.6, 901 A.2d 649 (2006). The respondent mother contends that the intervenor does not have standing to bring this appeal challenging the revocation of the commitment of Shanaira because her standing terminated when the court denied her motions for guardianship and visitation and committed Shanaira to the custody of the commissioner. We disagree.

As noted, the intervenor was granted intervenor status on May 9, 2006. Practice Book § 35a-4[3] permits inter-

[3] Practice Book § 35a-4 provides in relevant part: "(b) Other persons including, but not limited to, siblings may move to intervene in the dispositional phase of the trial and the judicial authority may grant said motion if it determines that such intervention is in the best interest of the child or in the interests of justice.

"(c) In making a determination upon a motion to intervene by any other applicant, the judicial authority shall consider:

"(1) the timeliness of the motion as judged by all the circumstances of the case;

"(2) whether the applicant has a direct and immediate interest in the case;

"(3) whether the applicant's interest is not adequately represented by existing parties;

vention in the dispositional phase of the trial.[4]
"Disposition in a neglect petition may take one of a number of forms, including return to parents, return to parents with a protective order, foster care placement, or the initiation of proceedings to terminate parental rights." (Internal quotation marks omitted.) *In re Elisabeth H.*, 40 Conn. App. 216, 219, 669 A.2d 1246 (1996). "Whether to maintain or revoke the commitment is a dispositional question . . . ." Practice Book § 35a-14 (c).

Here, although the commitment of Shanaira to the custody of the commissioner was a disposition, the court indicated that the commitment was temporary and continued the matter to December 15, 2006, with the stated intention of transferring custody of Shanaira to the respondent mother on that date. The intervenor objected to the revocation of the commitment and the transfer of custody to the respondent mother, contending that it was not in Shanaira's best interest. Because the revocation of commitment is a step in the dispositional phase of a neglect petition and, in this case, was a necessary step in facilitating the court's intended disposition, the intervenor was a proper party to that proceeding.

Appellate standing is established "if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely

"(4) whether the intervention may cause delay in the proceedings or other prejudice to the existing parties;

"(5) the necessity for or value of the intervention in terms of resolving the controversy before the judicial authority.

"(d) Upon the granting of such motion, such grandparent or other applicant may appear by counsel or in person. Intervenors are responsible for obtaining their own counsel and are not entitled to appointment of counsel at state expense by the court."

[4] We note that although the judicial form for intervention refers to General Statutes §§ 46b-129 (c) and 46b-57, Practice Book § 35a-4, which took effect January 1, 2003, is the pertinent rule governing the intervention in this case.

affected." (Internal quotation marks omitted.) *Hunt* v. *Guimond*, 69 Conn. App. 711, 715, 796 A.2d 588 (2002). Because the court's ruling revoking the commitment was adverse to the intervenor's interest in the disposition of the neglect petition, the intervenor has standing to bring this appeal.

The intervenor first claims on appeal that the court violated her due process rights in failing to hold an evidentiary hearing on the motion to revoke the commitment.

"The issue of whether the court violated the defendant's procedural due process rights is a question of law over which this court's review is plenary. . . . The fundamental requisite of due process of law is the opportunity to be heard. . . . The hearing must be at a meaningful time and in a meaningful manner. . . . Inquiry into whether particular procedures are constitutionally mandated in a given instance requires adherence to the principle that due process is flexible and calls for such procedural protections as the particular situation demands. . . . There is no per se rule that an evidentiary hearing is required whenever a [property] interest may be affected. Due process . . . is not a technical conception with a fixed content unrelated to time, place and circumstances. . . .

"The United States Supreme Court analyzes claims of procedural due process in accordance with the three part test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The Connecticut Supreme Court uses the same test. . . . That test requires a consideration of the private interest that will be affected by the official action, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and the Government's interest, including the function involved

and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Citations omitted; internal quotation marks omitted.) *GMAC Mortgage Corp.* v. *Glenn*, 103 Conn. App. 264, 273–74, 931 A.2d 290 (2007). "Due process does not mandate full evidentiary hearings on all matters, and not all situations calling for procedural safeguards call for the same kind of procedure. . . . So long as the procedure afforded adequately protects the individual interests at stake, there is no reason to impose substantially greater burdens . . . under the guise of due process." (Citation omitted; internal quotation marks omitted.) Id., 275. "The bottom-line question is whether the denial rendered the [proceeding] fundamentally unfair in view of the *Mathews* factors." *In re Shaquanna M.*, 61 Conn. App. 592, 606, 767 A.2d 155 (2001).

As noted, Practice Book § 35a-4 permits intervention in the dispositional phase of a neglect proceeding. In this case, the intervenor participated in every aspect of the neglect proceedings, including the revocation hearing. Over the course of the five days of trial on the neglect petition, the intervenor filed motions, cross-examined witnesses, called witnesses on her behalf and made arguments to the court. On the date that the court considered revocation, however, the record reveals that the nature of the intervenor's interest in the case had changed because her previously filed motions for guardianship and visitation had been denied. Therefore, although she still had standing to participate in the continuing dispositional phase of the proceeding, her personal interest in the proceeding was diminished.

At the revocation hearing, the intervenor indicated her intention to introduce the testimony of her mother and Shanaira's foster mother.[5] On the basis of the scant

---

[5] In support of her contention that she had a right to call her own witnesses, the intervenor repeatedly relied on the fact that the foster mother has a statutory right to be heard in a revocation proceeding. Although the interve-

representations made by the intervenor and in the absence of an offer of proof as to the testimony she sought to introduce, we can glean that she intended to show that the child's behavior had deteriorated since the last hearing. Thus, in seeking to introduce testimony, the intervenor was not attempting to further her personal interests in obtaining guardianship or visitation but, rather, she apparently was trying to prevent custody from being transferred to the respondent mother.

Although the intervenor was not permitted to call witnesses at the revocation hearing as she had requested, the court did hear testimony from Shanaira's foster mother and teacher.[6] Both witnesses testified, when examined by the court, as to the time period since the last hearing, the same time period that the intervenor sought to address. The intervenor did not at any point indicate that she wanted to question the witnesses further or that she would have presented testimony other than or in addition to that elicited by the court. After hearing this testimony, the court awarded custody of Shanaira to the respondent mother. Under these circumstances, it is not apparent that permitting the intervenor's mother to testify or allowing the intervenor to introduce the testimony of Shanaira's foster mother herself would have elicited any facts that were not already before the court. On this basis, and mindful of the diminished personal interest of the intervenor following the denial of her motions for guardianship and visitation, we do not find an erroneous deprivation of due process in refusing her request to call her own

nor is correct in this regard, counsel for the intervenor did not represent the foster mother at the hearing, and there is no authority for the proposition that she had a due process right to call her as her own witness.

[6] After indicating that it would hear the testimony of Shanaira's foster mother and teacher, the court inquired of the parties whether there was "anything else before we proceed?" The intervenor did not respond or object.

witnesses. We, therefore, conclude that the court afforded the intervenor all the process that she was due.

The intervenor next claims that the court abused its discretion in revoking the commitment because it failed to make a finding that a cause for commitment no longer existed. We are not persuaded.

Our review of this claim is controlled by General Statutes § 46b-129 (m), which provides in relevant part: "The commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, upon finding that cause for commitment no longer exists, and that such revocation is in the best interests of such child or youth, the court may revoke the commitment of any child or youth. . . ." "The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests." (Internal quotation marks omitted.) *In re Patricia C.*, 93 Conn. App. 25, 30, 887 A.2d 929, cert. denied, 277 Conn. 931, 896 A.2d 101 (2006).

"The trial court's determination . . . as to whether to maintain or revoke the commitment is largely premised on that prior adjudication. . . . The court, in determining whether cause for commitment no longer exists, would obviously look to the original cause for commitment to see whether the conduct or circumstances that resulted in commitment continue to exist. . . . Accordingly, the trial court considers not only the adjudication, but also the attendant facts." (Citations omitted; internal quotation marks omitted.) *In re Allison G.*, 276 Conn. 146, 160, 883 A.2d 1226 (2005).

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. We do not examine the record to determine

whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous." (Internal quotation marks omitted.) *In re Cameron C.*, 103 Conn. App. 746, 757, 784 A.2d 979, 930 A.2d 826 (2007).

Here, the intervenor provided this court only with the transcript from the December 15, 2006 hearing. In fact, the intervenor objected to the release of the transcripts of the remainder of the neglect proceeding and, therefore, we are unable to ascertain the court's specific reasons for committing Shanaira to the custody of the commissioner. We can discern from the neglect petition, however, that the allegations of neglect concerned Shanaira's father, with whom Shanaira was living at the time the petition was filed. In revoking the commitment of Shanaira to the commissioner, the court talked extensively about the ability of the respondent mother to care for her. Although the court did not explicitly make a finding that the respondent mother's fitness to care for Shanaira meant that there was no longer a cause for commitment, this is clearly the import of the court's comments, particularly in light of the court's finding that it was in the best interest of Shanaira that the commitment be revoked and that sole custody be granted to the respondent mother. Thus, even on the basis of the sparse record provided by the intervenor, we conclude that the court's conclusion was legally and factually supported.

The judgment is affirmed.

In this opinion GRUENDEL, J., concurred.

BORDEN, J., dissenting. I agree with the majority that the intervenor, Stephanie E., has standing to appeal in this case. I disagree, however, with the majority's conclusion that the intervenor's due process rights were not violated by the procedures adopted by the trial court in the hearing on the motion by the petitioner, the commissioner of children and families, to revoke the commitment. I would conclude that, as both the intervenor and the minor child argue,[1] (1) the court did not provide a proper evidentiary hearing on that motion, as contemplated by General Statutes § 46b-129 (m)[2] and Practice Book § 35a-14 (c),[3] and (2) the hearing that the court did provide violated the intervenor's due process rights. I therefore respectfully dissent, and would reverse the judgment of the trial court and remand the case for a new hearing on the petitioner's motion to revoke commitment.[4]

The following procedural history, some of which is described in the majority opinion, is undisputed

[1] Although it is not noted in the majority opinion, the minor child adopted the arguments of the intervenor in this appeal.

[2] General Statutes § 46b-129 (m) provides: "The commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, upon finding that cause for commitment no longer exists, and that such revocation is in the best interests of such child or youth, the court may revoke the commitment of such child or youth. No such motion shall be filed more often than once every six months."

[3] Practice Book § 35a-14 (c) provides: "Whether to maintain or revoke the commitment is a dispositional question, based on the prior adjudication, and the judicial authority shall determine whether it is in the best interest of the child to maintain or revoke upon a fair preponderance of the evidence. The party seeking to maintain the commitment has the burden of proof that it is in the best interest of the child to maintain the commitment. The party seeking revocation of commitment has the burden of proof that no cause for commitment exists. If the burden is met, the party opposing the revocation has the burden of proof that revocation would not be in the best interest of the child. If a motion for revocation is denied, a new motion shall not be filed by the movant until at least six months has elapsed from the date of the filing of the prior motion unless waived by the judicial authority."

[4] Because I conclude that the dispositional hearing was both statutorily and constitutionally inadequate, I do not reach the question of whether the evidence supported the court's revocation of commitment.

between the majority and this dissent. The parties to the proceedings were (1) the petitioner; (2) the minor child, Shanaira C.; (3) the father of the child; (4) the respondent mother of the child, who, at the time of the filing of the petition, was living in Florida; and (5) the intervenor,[5] who was the father's girlfriend and had been the child's caretaker for the prior two years while the father and she had been living together. All were represented by counsel.

On March 24, 2006, the petitioner took the child into temporary care and custody pursuant to the ninety-six hour hold provision of General Statutes § 17a-101 (g). On March 28, 2006, the petitioner filed a neglect petition and a motion for an order of temporary custody regarding the child, which the court, *Dannehy, J.*, granted ex parte. As a result, the child was removed from the custody of the father. She was placed in the custody of the petitioner and placed in temporary foster care with the mother of the intervenor. On April 3, 2006, the father's girlfriend, the intervenor, moved to intervene pursuant to Practice Book § 35a-4 (b).[6] On April 7, 2006, the order of temporary custody was sustained by agreement. On April 9, 2006, the court, *A. Santos, J.*, granted the intervenor's motion to intervene on the ground that the child referred to her as the child's mother, she had cared for the child for the prior two years and that intervention was in the best interest of the child. Thereafter, on September 1, 2006, the child was placed in foster care with her aunt, the father's sister. On July 5, 2006, the intervenor filed a motion

[5] Although the father's girlfriend did not intervene until April 9, 2006, as I will discuss, for purposes of consistency and clarity I refer to her as the intervenor throughout this opinion.

[6] Practice Book § 35a-4 (b) provides: "Other persons including, but not limited to, siblings may move to intervene in the dispositional phase of the trial and the judicial authority may grant said motion if it determines that such intervention is in the best interest of the child or in the interests of justice."

to transfer guardianship of the child to her and, on September 18, 2006, filed a motion for visitation with the child, which the court consolidated for hearing with the hearing on the neglect petition.

The neglect petition and the intervenor's motions were heard by the court, *Hon. William L. Wollenberg,* judge trial referee, on September 18 and 21, and October 17, 2006. At the close of evidence on October 17, the court adjudicated the child neglected, denied the intervenor's motions and excused the intervenor from the case.

At the next hearing date, November 2, 2006, however, pursuant to the petitioner's motion, the court rescinded its ruling to excuse the intervenor from the case. At the close of evidence on that date, the court ordered the child committed to the custody of the petitioner and indicated its intention to send the child to Florida to live with the respondent mother. The court set December 15, 2006, as the next hearing date, and stated: "Unless there's something that comes that's drastic, [the child will] be going to Florida. . . . I'm telling you, this is a preview of coming attractions if everything is fine. If I get here . . . on [December 15] and this is not the case, then things will take a different turn. But at this point with the evidence I have, I have plenty of evidence to make this decision if things are the same. That's what I want to find out." On December 12, 2006, the petitioner filed a motion to revoke the commitment on the ground that reunification of the child with the respondent mother was in her best interest and that the cause for commitment no longer existed. Accordingly, the petitioner moved that the court revoke the commitment and restore guardianship of the child to the respondent mother.

On December 15, 2006, all parties were in attendance. Before the court were (1) the in-court review that the

court had ordered and (2) the petitioner's motion to revoke the commitment. When the intervenor stated that she would be calling witnesses regarding the petitioner's motion to revoke commitment, because that involved, as she stated to the court, "a dispositional hearing," the court indicated its view that she had been a party only for the purpose of seeking guardianship, which the court had denied. The intervenor, in response, stated that she was "a party, this is a dispositional hearing, and we argue that we have a right to call witnesses, and we have a right to argue *whether this is in the best interest of the child*" and that "this is a revocation of commitment, [t]his is a hearing, we have witnesses." (Emphasis added.) The intervenor then stated that she would be "[b]ringing on witnesses to show that there has been a terrible decline in this child's behavior and her schoolwork," that "[w]e have new evidence, Your Honor, and I remember you saying the last time we were here that it would be likely that you may revoke the commitment. Not that you automatically were, barring some significant issues that may have arisen, and we believe that there have been, Your Honor." When the court asked the intervenor what witnesses she would be offering, the intervenor said that she intended to offer the child's foster mother, the intervenor's own mother "whom the child has been visiting with," and with whom the child had originally been placed in temporary foster care from March 28 until September 1, 2006, and that the child's attorney would be offering the child's teacher. The intervenor stated, in furtherance of her offer of proof, that "[r]ecently . . . there has been a significant deterioration" in the child's well-being.

The court ruled that the intervenor had no standing on the basis of its view that her only cognizable interest was her previously denied interest in seeking guardianship of the child. The court stated that it would hear

only from the child's foster mother, who "may make a statement," and the child's teacher.[7]

The court then brought the child's foster mother into the courtroom, and the petitioner clarified that "this is not an examination, correct, Your Honor; she's making a statement?" The court affirmed that, "[n]o, she's making a statement, she's making a statement." After the foster mother was sworn in, the court addressed her. It told her that she was being asked "to give us a statement . . . it's as though you were writing a letter to us . . . [l]etting us know how Shanaira is doing . . . and say whatever you want and we'll bear with you. . . . Don't be concerned if you have to just rattle things off." After the foster mother's statement, the court excused her, without inviting any party to examine her.

The court then brought in the child's teacher and examined her in a question and answer format. When the court was about to excuse her, the child's attorney requested that she be permitted to ask "one question that . . . I was hoping would be touched on, that wasn't." The court stated, "yes, go ahead, I'm going to let you do that." After a brief series of questions by the child's attorney and some follow-up questions by the court, the court excused the witness.

The court then invited argument on the petitioner's motion to revoke commitment. Counsel for the petitioner argued in favor of revocation. Then, counsel for the child and the father offered their arguments opposing revocation. When the intervenor's counsel asked to do so, the court stated: "Very shortly, madam. I'll hear you out of respect for you, and that's all. I don't think you have standing . . . ." The intervenor's counsel then made a brief statement.

---

[7] The petitioner stated to the court that "the court is the sole judge of the evidence, the court controls how much evidence it hears, when to close evidence."

The court then rendered its decision. It found that it was in the child's best interest that the commitment to the petitioner be revoked and that sole custody be granted to the respondent mother in Florida. It stated: "The child will be going to Florida with [the respondent mother]. . . . And it starts today." Accordingly, the child left for Florida with the respondent mother before the twenty day appeal period had expired. The intervenor did not seek a stay and filed her appeal in this case on January 4, 2007. The child has since been living with the respondent mother in Florida.

Although the majority treats the intervenor's argument on appeal as if it only claimed a violation of due process, I read the claim as in two parts, namely, that the court did not provide a proper evidentiary hearing, as required by (1) statute and the rules of practice and (2) due process of law. I agree with the intervenor on both parts of the claim.

I

Preliminarily, I address the court's determination that the intervenor had no standing in the hearing on the petitioner's motion to revoke commitment because her previous motion for guardianship had been denied. This was incorrect. She had been granted intervenor status, not because she sought guardianship, but because, as the caretaker for the child for the prior two years, to whom the child referred as "mommy," the court had determined that it was in the best interest of the child that she be permitted to intervene, and at that point there was no indication that she intended to seek guardianship. Indeed, the petitioner subsequently recognized as much by successfully requesting the court to rescind its prior order excusing her from the case following the denial of her motion for guardianship. Moreover, she made it clear at the hearing on the motion to revoke

commitment that she sought to advance, not her interest, but that of the child. See Practice Book § 35a-4 (b).

I next note that the hearing on the motion was contested. Thus, whatever informal procedures may be desirably employed in uncontested dispositional hearings in such sensitive matters as the placement of children by the juvenile division of the Superior Court, I know of no statute, rule of practice or principle that permits such procedures to be used in contested hearings. Compare, e.g., General Statutes § 46b-129 (g),[8] which provides for limited use of hearsay evidence at a contested hearing on an order for temporary custody.

Although, I recognize that the court had heard considerable evidence in the adjudicatory phase of the proceeding and had clearly indicated its intention to send the child to Florida to live with the respondent mother, that did not permit the court to dispense with the procedural requirements attendant on a motion to revoke commitment, absent agreement by all the interested parties. Moreover, the court's indicated intention was explicitly conditional on whether new evidence would

[8] General Statutes § 46b-129 (g) provides: "At a contested hearing on the order for temporary custody or order to appear, credible hearsay evidence regarding statements of the child or youth made to a mandated reporter or to a parent may be offered by the parties and admitted by the court upon a finding that the statement is reliable and trustworthy and that admission of such statement is reasonably necessary. A signed statement executed by a mandated reporter under oath may be admitted by the court without the need for the mandated reporter to appear and testify unless called by a respondent or the child, provided the statement: (1) Was provided at the preliminary hearing and promptly upon request to any counsel appearing after the preliminary hearing; (2) reasonably describes the qualifications of the reporter and the nature of his contact with the child; and (3) contains only the direct observations of the reporter, and statements made to the reporter that would be admissible if the reporter were to testify to them in court and any opinions reasonably based thereupon. If a respondent or the child gives notice at the preliminary hearing that he intends to cross-examine the reporter, the person filing the petition shall make the reporter available for such examination at the contested hearing."

be produced, which the intervenor sought to bring to the court's attention, and the court did not explicitly say that it intended to grant full guardianship to the respondent mother without any judicial oversight.[9]

## II

With this background in mind, I turn to the intervenor's claim that the court was required by statute and Practice Book rule to conduct a proper evidentiary hearing on the petitioner's motion to revoke commitment. It is axiomatic that the court must conduct an evidentiary hearing on a motion for an order of temporary commitment. The requirement for such a hearing is implicit in the statutory scheme for such a motion; see General Statutes § 46b-129 (b) through (j); by our case law; see, e.g., *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 295, 455 A.2d 1313 (1983); *In re Brianna C.*, 98 Conn. App. 797, 804, 912 A.2d 505 (2006); and by our rules of practice; see, e.g., Practice Book §§ 35a-7, 35a-8 and 35a-9.[10] Indeed, it is unthinkable that our law would not

---

[9] Indeed, both the intervenor and the child's counsel unsuccessfully sought to persuade the court to have the child governed by an interstate compact arrangement by virtue of which there would be such oversight.

[10] Practice Book § 35a-7 provides: "(a) In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights.

"(b) In the discretion of the judicial authority, evidence on adjudication and disposition may be heard in a non-bifurcated hearing, provided disposition may not be considered until the adjudicatory phase has concluded."

Practice Book § 35a-8, which governs the burden of proof, provides: "(a) The petitioner shall be prepared to substantiate the allegations of the petition. If a custodial parent fails to appear, the judicial authority may default that parent, evidence may be introduced and judgment rendered. In the event of a coterminous hearing, the judicial authority shall ensure that the parents are given adequate time to appear.

"(b) The clerk shall give notice by mail to the defaulted party and the party's attorney of the default and of any action taken by the judicial authority. The clerk shall note on the docket the date that such notice is given or mailed."

Practice Book § 35a-9, which governs admissibility of evidence at the dispositional hearing, provides: "The judicial authority may admit into evidence any testimony relevant and material to the issue of the disposition,

require such a hearing for such sensitive and important factual determinations as whether a child has been neglected and where the child's best interest lies.

The same is true, therefore, for the factual determinations that accompany a ruling on a motion to revoke commitment. It is equally unthinkable that a court would be permitted to determine that the cause for a prior commitment no longer exists and that the best interest of a child requires a different placement without an evidentiary hearing, at least when those sensitive facts are contested. Although § 46b-129 (m),[11] which governs revocation of commitments is quite brief, its requirements of the court's "finding that cause for commitment no longer exists, and that such revocation is in the best interests of such child" imply a similar evidentiary hearing. Our case law clearly implies the same. See *In re Patricia C.*, 93 Conn. App. 25, 30, 887 A.2d 929 (in revocation of commitment proceeding, burden of proof is on movant to prove that cause for commitment no longer exists; once that is established, question is what placement is in child's best interest), cert. denied, 277 Conn. 931, 896 A.2d 101 (2006); see also *In re Nasia B.*, 98 Conn. App. 319, 330, 908 A.2d 1090 (in revocation of commitment proceeding, court must follow mandate of statute). Our Practice Book provision makes it even clearer. Practice Book § 35a-14 (c),[12] which governs proceedings on motions to revoke commitment, explicitly provides that such a proceeding "is a dispositional question" and allocates the varying burdens of proof on the questions of whether the original cause for commitment still exists and what is in the

including events occurring through the close of the evidentiary hearing, but no disposition may be made by the judicial authority until any mandated social study has been submitted to the judicial authority. Said study shall be marked as an exhibit subject to the right of any party to require that the author, if available, appear for cross-examination."

[11] See footnote 2.

[12] See footnote 3.

best interest of the child. It is obvious that allocations of burdens of proof imply an evidentiary hearing.

The hearing provided by the court lacked the fundamental hallmarks of a proper evidentiary hearing, namely, the right to present witnesses and to examine the witnesses who did testify. The intervenor was not permitted to bring forth or question witnesses, including one witness, the intervenor's mother, who never testified. The intervenor was not permitted to question the witnesses who did testify. The court, with limited exceptions, conducted all of the examinations of those witnesses who were brought forth, and the intervenor was not permitted even to ask follow-up questions.[13] This simply was not a proper evidentiary hearing as our law knows it.

### III

Although in my view this conclusion would resolve this appeal, I nonetheless address the due process analysis employed by the majority because of its conclusion that the hearing comported with due process. Although I agree with the majority that the three part test articulated in *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), applies, I disagree with how the majority applied it in this case.[14] In my view, the proper application of the *Mathews* test compels the conclusion that a proper evidentiary hearing was required.

The first part of the *Mathews* test requires consideration of the private interest that will be affected by the official action. In my view, the majority has misidentified the interest at stake here. That private interest was

---

[13] The majority suggests that the intervenor did not ask to do so. It is clear that such a request would have been futile because the court had made clear its view that she had no standing in the proceeding.

[14] Indeed, the majority does not appear even to apply the second and third parts of the *Mathews* test.

not, as the majority suggests, the intervenor's interest in obtaining guardianship or custody of the child. As the majority correctly notes, that had already been determined by the court. She had been permitted to intervene premised on the child's best interest. That premise did not disappear simply because she also unsuccessfully sought to gain custody of the child. Thus, the private interest at stake in the dispositional hearing on the petitioner's motion to revoke commitment was, instead, the best interest of the child. It is clear from the transcript that, as a factual matter, that was what the intervenor was seeking to protect in the dispositional revocation hearing, and it is even clearer that, as a legal matter, that was what was at stake in that hearing. The intervenor's interest in the best interest of the child did not end or diminish with the adverse determination of the intervenor's attempt to gain guardianship of the child, as the majority suggests. There can be few more important private interests than this, and, therefore, the accuracy of the fact-finding process is extremely important. That accuracy can best be effectuated by a traditional evidentiary hearing, with the right to present and examine witnesses. As Professor Wigmore has famously stated, cross-examination "is beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 J. Wigmore (Chadbourn Rev. Ed. 1974) § 1367, p. 32.

The second factor is the risk of an erroneous deprivation of such interest through the procedures used and the probable value of additional or substitute procedural safeguards. This factor, also, persuasively points to the necessity of a properly conducted evidentiary hearing. The risk of harm to a child arising from an erroneous determination of the best interest of that child is obvious, as is the value of the additional procedural safeguards of the right of an intervenor to present

and examine witnesses. The participation of an intervenor, such as the intervenor here, would reduce the risk of an erroneous determination. The intervenor had been the caretaker of the child for two years, and the witness whom she sought to present had been the child's foster caretaker for five months and had visited with the child recently. She sought to bring in new evidence, through presentation of the witness and through examination of the current foster mother, of a recent deterioration in the child's schoolwork and behavior. This was evidence that would have enhanced the reliability of the court's ultimate decision.

The third factor is the petitioner's interest, including the function involved and the fiscal and administrative burdens that the additional procedural safeguards would entail. This factor also points persuasively in favor of a full evidentiary hearing. The petitioner's interest was also the best interest of the child, and it would have entailed very little administrative burden for the court to engage in what would normally be expected, namely, a proper evidentiary hearing. All that would have been involved would have been to permit the intervenor to present her mother as a witness and to examine the witnesses who did testify. Generally, the administrative costs involved would be those associated with allowing an intervenor to present evidence, to call witnesses and to cross-examine the witnesses of others. Given the broad discretion that the court is authorized to exercise in evidentiary matters, so as to exclude unduly repetitious and only marginally relevant material, it is difficult to see, in light of what was at stake, how allowing an intervenor to participate fully in a proper evidentiary hearing could be deemed an excessive administrative burden.

I would, therefore, reverse the judgment and order a new dispositional hearing on the petitioner's motion to revoke commitment. I recognize, however, that the

child has now been living in Florida with the respondent mother for more than one year. It would be blinking at reality and would be inconsistent with the goal of such a hearing, namely, to determine the child's best interest, to ignore that fact. I would, therefore, also order that the dispositional hearing focus on the present status of the child and what is in her best interest at the time of the new hearing.